# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

MARK ANTHONY ADELL,

      Plaintiff,

v.

RANDALL HEPP, CHRIS KRUEGER, JOHN MAGGIONCALDA, LT. JOHN CONGDON, MARK SCHOMISCH, WISCONSIN DEPARTMENT OF CORRECTIONS, and JON LITSCHER,

      Defendants.

Case No. 17-CV-267-JPS

**ORDER**

    Plaintiff Mark Anthony Adell ("Adell"), a prisoner, brings this action against Defendants, prison officials at Fox Lake Correctional Institution ("FLCI"), the Wisconsin Department of Corrections ("DOC"), and the DOC Secretary, Jon Litscher ("Litscher"), for their alleged failure to properly treat and accommodate Adell's needs arising from his chronic ulcerative colitis. Specifically, Adell alleges that he was forced to drink contaminated drinking water while incarcerated in the restricted housing unit ("RHU") at FLCI between December 12, 2016, and January 24, 2017. The Court allowed Adell to proceed on both constitutional claims under 42 U.S.C. § 1983 and statutory claims under the Americans With Disabilities Act ("ADA") and Rehabilitation Act. *See* (Docket #15). Defendants filed a motion for summary judgment that addressed the constitutional claims only. (Docket #34). The motion is fully briefed and, for the reasons stated below, it will be granted.

1.  **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56 provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). The court must not weigh the evidence presented or determine credibility of witnesses; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). The party opposing summary judgment "need not match the movant witness for witness, nor persuade the court that [his] case is convincing, [he] need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

2.  **RELEVANT FACTS**

    **2.1  Adell's Failure to Dispute the Material Facts**

The relevant facts are undisputed because Adell did not properly dispute them. In the Court's scheduling order, issued on May 10, 2017, Adell was warned about the requirements for opposing a motion for summary judgment. (Docket #18 at 3). Accompanying that order were copies of Federal Rule of Civil Procedure 56 and Civil Local Rule 56, both of which describe in detail the form and contents of a proper summary

judgment submission. Most relevant here is Local Rule 56(b)(2), which obligates the non-movant on summary judgment to file "a concise response to the moving party's statement of facts that must contain a reproduction of each numbered paragraph in the moving party's statement of facts followed by a response to each paragraph, including, in the case of any disagreement, specific references to the affidavits, declarations, parts of the record, and other supporting materials relied upon[.]" Civ. L. R. 56(b)(2)(B)(i).

Next, on November 1, 2017, Defendants filed their motion for summary judgment. (Docket #34). In the motion, Defendants also warned Adell about the requirements for his response as set forth in Federal and Local Rules 56. *Id.* at 1–2. He was provided with additional copies of those Rules along with Defendants' motion. *See id.* at 3–12. In connection with their motion, Defendants filed a supporting statement of material facts that complied with the applicable procedural rules. (Docket #35). It contained short, numbered paragraphs concisely stating those facts which Defendants proposed to be beyond dispute, with supporting citations to the attached evidentiary materials. *See id.*

In response, Adell submitted three documents, none of which respond to Defendants' statement of facts in compliance with the Federal and Local Rules. The first is his brief in opposition to Defendants' motion. (Docket #43). It contains a prose recitation of his version of the relevant events, *id.* at 2–3, but it neglects to specifically address the numbered paragraphs set forth in Defendants' statement of facts. Attached to the brief are nearly 100 pages of exhibits, including medical records and inmate grievances. *See* (Docket #43-1). Similarly, Adell's other submissions, which include his affidavit and his own proposed findings of fact, provide few

citations to actual evidence, and do not address Defendants' statement of facts in any fashion. (Docket #44, #45).

Despite being twice warned of the strictures of summary judgment procedure, Adell ignored those rules by failing to properly dispute Defendants' proffered facts with citations to relevant, admissible evidence. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). Though the Court is required to liberally construe a *pro se* plaintiff's filings, it cannot act as his lawyer, and it cannot delve through the record to find favorable evidence for him. *See Waldridge*, 24 F.3d at 922; *Herman v. City of Chicago*, 870 F.2d 400, 404 (7th Cir. 1989) ("A district court need not scour the record to make the case of a party who does nothing."). Further, while the Court is cognizant that Adell lacks legal training, his utter failure to comply with the rules of procedure is not excusable on that ground alone. Thus, the Court will, unless otherwise stated, deem Defendants' facts undisputed for purposes of deciding their motion for summary judgment. *See* Fed. R. Civ. P. 56(e); Civ. L. R. 56(b)(4); *Hill v. Thalacker*, 210 F. App'x 513, 515 (7th Cir. 2006) (noting that district courts have discretion to enforce procedural rules against *pro se* litigants).

### 2.2 Facts Material to Defendants' Motion

#### 2.2.1 FLCI Water System and Compliance Efforts

FLCI has a municipal water system, but is unique in that the owner of the water system—the State of Wisconsin—also owns all of the buildings that the water system services. The Wisconsin Department of Natural Resources ("DNR") requires regular sampling and testing of drinking water as part of maintaining any municipal water system. The DNR entered into a consent order with the DOC to address the water quality at FLCI in May 2014 after test results showed that despite FLCI's efforts (and

following remediation recommended by the DNR), water test samples continued to show elevated levels of certain elements in the prison's water supply.

Drinking water regulations are promulgated by the Environmental Protection Agency. One such regulation is pertinent here. It is known as the "Lead and Copper Rule," and it addresses the transfer of lead and copper from piping materials into water. The Rule prescribes "action" levels, or maximum contaminant level limits, for metals including lead, copper, and arsenic. An "action" level of contaminants does not reflect that the water is unsafe to consume but rather is the point at which consumer education, continued investigation, and development of a plan to resolve the issue become necessary. The action level for lead in the Lead and Copper Rule is 15 parts per billion. Ninety percent of the samples collected must be under 15 parts per billion for compliance. The action level for copper is 1,300 parts per billion.

Aesthetic issues, such as discolored water or odors, are not dangerous to human health, and discolored water often results from iron and manganese. Iron often gives water a rusty hue, and manganese can give water a brownish or black hue. Discolored water is a very common issue in all water systems, and all water systems can suffer "events" that may lead to discolored water. Secondary drinking water regulations address aesthetic issues with water, which do not pose health concerns, but may cause staining in sinks and laundry, for example.

In the consent order, FLCI agreed to provide required public education regarding lead and copper action level exceedances, submit rehabilitation plans for portions of the water system, and obtain compliance with Safe Drinking Water Act lead and copper standards. FLCI was also

required to establish a routine monitoring schedule for lead and copper. FLCI's warden, Defendant Randall Hepp ("Hepp") signed the consent order on behalf of FLCI. Nothing in the consent order indicated that the water at FLCI was unsafe for human consumption or that FLCI should provide water from another source for drinking by FLCI inmates and staff.

To comply with the consent order's requirement that a comprehensive water study be completed, the State hired expert engineer Abigail Cantor ("Cantor"). Cantor was first contacted by the Wisconsin Department of Administration after FLCI experienced Lead and Copper Rule compliance issues in 2013. Cantor consults on water quality issues in water distribution systems stemming from the Lead and Copper Rule nationwide. Cantor's approach to water quality analysis "promote[s] the use of many measurements of water quality in order to make decisions about the system. [Cantor] has a technique to determine the mechanisms that are causing the lead and copper to transfer to the water and then [suggests] remedies for inhibiting the transfer." (Docket #35 ¶ 20). Cantor is typically hired to investigate an existing problem within water distribution systems. In addition to discovering the origin of the problem and advising what needs to be done to remedy it, she also recommends a proactive approach to solving future problems, including continued data collection and routine water evaluation.

Cantor was hired by the State to analyze FLCI's municipal water system, the distribution system, and the water quality within the buildings. Cantor's initial work at FLCI included the installation of a monitoring system in June 2013. The State also hired an independent laboratory to take weekly water samples at FLCI. Further, because Cantor is not a well expert,

she recommended, and the State hired, Dr. Andrew Jacques to investigate the wells that are connected to the system.

Cantor continues to be involved with water quality monitoring at FLCI, continues to receive these weekly water quality sample reports, and advises FLCI regarding the water quality. Cantor works directly with William Weisensel, a non-defendant, who is the utility plant operator at FLCI. Cantor worked on water quality issues with FLCI for at least three years before the time that is relevant to Adell's claims.

### 2.2.2 Adell's Complaints Regarding Water Quality

Against this backdrop, the facts directly relevant to Adell's claims are quite limited. Adell has chronic ulcerative colitis as a complication of Crohn's disease. According to him, this condition means that he has to use the restroom often and that the need to do so arises urgently and without warning. He also needs to take medications daily, including a daily drink mix to replenish his electrolytes.

From March 11, 2014 until January 24, 2017, Adell was housed at FLCI. Between December 12, 2016 and January 24, 2017, Adell was housed in the RHU at the prison. When he was first taken the RHU, a correctional officer attempted to place him in a cell with another inmate. When Adell refused, he was assigned to a single-person cell, which he occupied for the entire time he was in RHU. He was separately issued a conduct report for his disobedience. On January 24, 2017, Adell was transferred to the Wisconsin Secure Program Facility ("WSPF").[1]

---

[1] Adell is unhappy that he was disciplined for requesting a single cell, which he believed he was entitled to, *see* (Docket #43 at 2), but the disciplinary proceedings have no bearing on the disposition of the present motion.

Elevated levels of manganese and iron were detected at FLCI following testing in June 7, 2016. Iron and manganese compounds are common in Wisconsin groundwater. Manganese and iron are regulated only via "secondary standards," which are used to judge taste, color, and smell of drinking water. The water test results also showed that lead and copper levels were well below action levels prescribed in the Lead and Copper Rule. On June 30, 2016, Warden Hepp sent a notice to all inmates and prison staff explaining that lead and copper testing showed both to be well within acceptable limits.

The DNR notified FLCI in a letter dated October 10, 2016 that the elevated levels of iron and manganese were above aesthetic levels but did not create a health risk. DNR required that FLCI post a notice to warn inmates and staff about these elements. The notice explained that the water remained safe to drink, although it might not look, smell, or taste very good. It also stated that infants, young children, and those with liver disease were at risk of health problems if they had prolonged exposure to high levels of manganese in water. The notice said nothing about auto-immune or bowel conditions.

Cantor testified at her deposition in a related case that some unknown event around October 31, 2016, perhaps in the well or in the piping system, caused a disturbance in the water system which released some additional iron into the water supply, discoloring it. Adell first complained of contaminated water on November 16, 2016, when he filed an offender complaint. He wrote: "[t]he water here at FLCI is contaminated and the water report itself confirms that people with the type of medical problems I have (autoimmune) are at a high risk. . . . While at recreation the water is unsafe as it pertains to my consumption." (Docket #38-1 at 11–12).

The complaint was returned to Adell because it contained more than one issue. He was instructed to address his medical issues to the health services manager and his issues with restroom use, water quality, and requesting an institution transfer to the program director. Adell failed to do so and the complaint was dismissed by the inmate complaint examiner. Chris Krueger ("Krueger"), the deputy warden, affirmed the dismissal.

Cantor noted that there has only been one lead release event since she has monitored FLCI. That event occurred in December 2016, and was caused during maintenance on the prison's fire protection system, which is connected to the municipal water system. Cantor theorizes that the fire suppression contractor opened and closed the valves quickly during testing, which likely resulted in the disturbance of accumulations, which caused discolored water. If discolored water is discovered at FLCI, the facilities manager and water systems operator flush the system to get the disturbed accumulation out, and they did so in January 2017.

Adell submitted another complaint on December 16, 2016, four days after entering the RHU, stating that "[t]he water at FLCI is contaminated. Advisory memos suggest that we allow the water to run in advance of drinking it to allow contaminants to be flushed. But for the new plumbing system installed at the seg building that is impossible. The system restricts use of water to 4 pushes per hour. . .every cup of water contains small metal flakes that settle at the bottom of the cup. There is no possible way to flush the system because it will lock you out." (Docket #38-2 at 7). This complaint was rejected as moot because Adell was transferred to WSPF before the complaint was investigated. Krueger affirmed the rejection.

On December 13, 2016, the DNR sent a "close out" letter to DOC regarding the May 2014 consent order. DNR commended DOC for their

work and cooperation and noted that DNR would not take further action, because the most recent sampling showed that FLCI was in compliance regarding lead and copper levels, which were the primary concerns addressed in the consent order.

On December 22, 2016, a public notice was posted at FLCI concerning the close-out of the consent order and the most recent water test results which demonstrated that lead and copper levels were well below the established thresholds for compliance. The notice warned that if the inmates wanted to further reduce their exposure to lead and copper in the drinking water, they could run the faucet briefly before drinking.

Adell submitted one other relevant complaint, on January 14, 2017. The complaint states that the water in the toilet and sink "had a brown tinge and sulfuric scent. Due to the water restrictions limited access to water/toilet usage, I was unable to flush the system—doing so would cause the water to lock me out of the system for one hour—only a few flushes/water button pushes allowed." (Docket #38-3 at 7). This complaint was rejected as moot because Adell had already been transferred to WSPF. Krueger affirmed the rejection.

Tests conducted on April 26, 2017 show that the lead and copper detected in the RHU building were well below the action level for these metals. There are no test results that show that Adell was exposed to levels of lead and copper that would negatively impact his health.

3.  **ANALYSIS**

In this case, Adell was permitted to proceed on two constitutional claims and two statutory claims. The constitutional claims, alleging inadequate conditions of confinement and deliberate indifference to Adell's serious medical needs, both arise under the Eighth Amendment and are

asserted against Hepp and Krueger, as well as Mark Schomisch, the FLCI security director, John Congdon, the prison security captain, and John Maggioncalda, the buildings and grounds supervisor. The two statutory claims, each alleging intentional discrimination and failure to provide reasonable accommodations for Adell's ulcerative colitis, arise under Title II of the ADA and the Rehabilitation Act, respectively. The statutory claims are asserted only against the DOC and Litscher.

As noted above, in their motion Defendants addressed only the constitutional claims. Those claims can be easily disposed of, as the undisputed facts reveal that the water at FLCI was not unsafe for drinking. The Court will address each in turn.

### 3.1 Conditions of Confinement

The Supreme Court has interpreted the Eighth Amendment as requiring a minimum standard for the treatment of inmates by prison officials: prison conditions must not, among other things, involve "the wanton and unnecessary infliction of pain." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). An inmate's constitutional challenge to the conditions of his confinement has two elements. *Whitman v. Nesic*, 368 F.3d 931, 934 (7th Cir. 2004). First, he must show that the conditions at issue were "sufficiently serious" so that "a prison official's act or omission results in the denial of the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotations omitted).

Even if conditions were sufficiently severe, the prisoner must also demonstrate that prison officials acted with "deliberate indifference" to the conditions. *See Wilson v. Seiter*, 501 U.S. 294, 302 (1991); *Whitman*, 368 F.3d at 934. "Deliberate indifference" means that the official knew that the inmate faced a substantial risk of serious harm from the conditions in

question, and yet disregarded that risk by failing to take reasonable measures to address it. *Farmer*, 511 U.S. at 847; *Johnson v. Phelan*, 69 F.3d 144, 149 (7th Cir. 1995). It is not enough for the inmate to show that the official acted negligently or that he or she should have known about the risk. *Pierson v. Hartley*, 391 F.3d 898, 902 (7th Cir. 2004); *Haley v. Gross*, 86 F.3d 630, 641 (7th Cir. 1996). Instead, the inmate must show that the official received information from which the inference could be drawn that a substantial risk existed, and that the official actually drew the inference. *Pierson*, 391 F.3d at 902. It is "obduracy and wantonness, not inadvertence or error in good faith, that characterizes the conduct prohibited by [the] Eighth Amendment[.]" *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

Adell's conditions-of-confinement claim fails because the FLCI water supply was simply not unsafe as a factual matter. The Seventh Circuit's decision in *Carroll v. DeTella*, 255 F.3d 470 (7th Cir. 2001), underscores the point. In that case, an inmate alleged that the prison drinking water was contaminated with lead and radium. *Id.* at 471. The lead resulted from corrosion in the pipes, and running the water for a few minutes before drinking eliminated any lead hazard. *Id.* at 471–72.

If this was all *Carroll* said, Adell would be happy to rely upon it, since the thrust of his complaint is that the RHU's burst-based water delivery system made it impossible to flush the water lines properly. But that was not the end of *Carroll*. The water also contained radium at almost twice the maximum level set by the EPA. *Id.* at 472. The court noted that the EPA was considering raising the maximum tolerable level of radium because of the low risk of harm from higher levels thereof, but it had not done so yet. *Id.*

The court nevertheless denied the claim, noting that "failing to provide a maximally safe environment, one completely free from pollution

or safety hazards, is not[]" cruel and unusual punishment. *Id.* "Many Americans live under conditions of exposure to various contaminants," wrote Judge Posner, and "[t]he Eighth Amendment does not require prisons to provide prisoners with more salubrious air, healthier food, or cleaner water than are enjoyed by substantial numbers of free Americans." *Id.* The court held that

> it would be inconsistent with this principle to impose upon prisons in the name of the Constitution a duty to take remedial measures against pollution or other contamination that the agencies responsible for the control of these hazards do not think require remedial measures. If the environmental authorities think there's no reason to do anything about a contaminant because its concentration is less than half the maximum in a proposed revision of the existing standards, prison officials cannot be faulted for not thinking it necessary for them to do anything either. They can defer to the superior expertise of those authorities.

*Id.* at 473. In sum, "[p]rison officials do not demonstrate deliberate indifference to the inmates' welfare which is the *sine qua non* of cruel and unusual punishment when they refuse to take measures against hazards that they reasonably believe to be nonexistent or slight." *Id.*

If exceeding the EPA's prescribed element levels did not support a claim in *Carroll*, complying with them—which FLCI did here—certainly cannot. At FLCI, the levels of copper, lead, manganese, and iron in the water did not exceed any EPA health standards in December 2016 or January 2017, when Adell was housed in the RHU. On December 13, 2016, the DNR closed out the 2014 consent order regarding lead and copper. Recent testing before and after this time showed that the lead and copper levels were well below the applicable thresholds. The iron and manganese levels, although they spiked during this time, likewise did not exceed any

health standards. In short, while FLCI certainly has had severe water quality issues in the past, the record evidence indicates that during the period relevant to this lawsuit, the water met all purity standards. Because the water "survived regulatory scrutiny, it cannot plausibly serve as the basis for a constitutional claim." *Moore v. Monahan*, 428 F. App'x 626, 630 (7th Cir. 2011); *see also White v. Monoham*, 326 F. App'x 385, 387 (7th Cir. 2009) (inmate stated claim for water pollution by submitting evidence that the water quality fell below EPA standards).

Adell complains that he was not able to secure expert testimony to contradict the water-quality analyses submitted by Defendants, *see* (Docket #43 at 7), but his imprisonment and indigency are not excuses for this failure, *see Porter v. Dep't of Treasury*, 564 F.3d 176, 180 n.3 (3d Cir. 2009). To be sure, there is no *per se* rule that expert testimony is required in a case like this one. But the key here is that Adell's personal conjecture cannot prove that the water was unsafe for his consumption. He asserts, without evidentiary support, that he required especially clean drinking water as a result of his ulcerative colitis. *See* (Docket #43 at 3); (Docket #47 ¶ 8). He further alleged in his inmate grievances that the RHU water supply had a brown tinge, a sulfurous odor, and contained metal flakes. (Docket #43 at 3, 7). Additionally, he could not flush out the apparently dirty water before drinking, as was possible in other areas of the prison, because of the burst delivery of water in the RHU. *Id.* at 8. Yet this criticism does not overcome the facts, which establish that the water supply, while perhaps not pristine, was not a health hazard. Beyond suggesting that Cantor's analysis is "junk" science, *id.* at 7, he has no evidence on this score.

Put differently, saying that the Constitution mandates clean drinking water is both true and irrelevant. Such a truism does not prove

that Adell had special water purity needs or that FLCI's water was unsafe. Adell's reliance on *Helling v. McKinney*, 509 U.S. 25 (1993), is thus misplaced, for there the Court explained that "a prison inmate also could successfully complain about *demonstrably unsafe* drinking water without waiting for an attack of dysentery." *Id.* at 32 (emphasis added). Contrary to Adell's belief that the Court "must accept as true" that the water was unsafe for him, he was obligated to come forward with evidence substantiating this. (Docket #43 at 6). He did not. Therefore, this claim fails as a matter of law.

### 3.2 Deliberate Indifference to Serious Medical Needs

Adell's other constitutional claim asserts that Defendants acted with deliberate indifference to his medical needs by subjecting him to contaminated drinking water while he was housed in the RHU. This claim fails for largely the same reasons as the conditions-of-confinement claim—namely, that there is no evidence from which a reasonable jury could conclude that FLCI's water was harmful to him.

To establish that Defendants were deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment, Adell was required to show: (1) an objectively serious medical condition; (2) that Defendants knew of the condition and were deliberately indifferent in treating it; and (3) this indifference caused him some injury. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).[2] The deliberate indifference inquiry with respect to medical needs is functionally identical to that applied to his conditions-of-confinement claim. "The official must have subjective knowledge of the risk to the inmate's health, and the official also must

---

[2]Defendants concede for purposes of their motion that Adell's bowel condition qualifies as an objectively serious medical condition. (Docket #39 at 10 n.5).

disregard that risk." *Id.* Even if an official is aware of the risk to the inmate's health, "he is free from liability if he 'responded reasonably to the risk, even if the harm ultimately was not averted.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 843 (1994)).

Further, "an inmate has no claim unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008) (internal quotation marks omitted; citation omitted). Even if a prison official failed to alleviate a significant risk of harm he or she should have perceived, there is no liability without actual knowledge. *Whiting v. Marathon County Sheriff's Dep't*, 382 F.3d 700, 704 (7th Cir. 2004).

Additionally, for purposes of this claim it is important to appreciate that Section 1983 creates a cause of action based upon personal liability and predicated upon fault. There is no vicarious liability under the statute. *Monell v. Dep't of Social Servs., City of NY*, 436 U.S. 658, 690–91 (1978). Consequently, it is not enough to allege that an official is liable on the basis of his supervisory status alone. *Id.* Instead, "plaintiff must prove that [each defendant] in particular knew about a substantial risk of harm, he may not allege facts about 'jail staff' generally." *Anderson v. County of La Crosse*, No. 08-CV-234-BBC, 2009 WL 1139991, at *3–5 (W.D. Wis. Apr. 27, 2009); *Chavez v. Ill. State Police*, 251 F.3d 612, 652 (7th Cir. 2001). "In order to recover damages against a state actor under § 1983, a plaintiff must show the actor was personally responsible for the constitutional deprivation." *J.H. ex rel. Higgin v. Johnson*, 346 F.3d 788, 793 (7th Cir. 2003). That said, a claim against a supervisor can be premised on the notion that he knew of the deprivation

and either condoned it or turned a blind eye toward it. *Pepper v. Vill. of Oak Park*, 430 F.3d 809, 810 (7th Cir. 2005); *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001); *Brokaw v. Mercer County*, 235 F.3d 1000, 1012 (7th Cir. 2000).

Adell's medical claim has several critical defects. First, except for deputy warden Krueger, none of the Defendants were even aware of Adell's complaints. Adell's offender complaints were addressed by the inmate complaint examiner and rejected or dismissed. The only Defendant who was alerted to his complaints was Krueger, who affirmed the disposition of each. None of Defendants apart from Krueger had any involvement with these complaints, and thus Adell cannot show that any of them were aware of his situation. Adell alleges that other inmates made other complaints about the FLCI water supply, (Docket #43 at 7–8), but this is irrelevant; what matters for Adell's constitutional claims against Defendants is that *they* were aware of *Adell*'s needs. Without awareness of Adell's purported plight, Defendants cannot be said to have turned a blind eye toward it.

Second, and more importantly, Adell has not shown that the water quality in the RHU caused him any harm, even assuming each Defendant knew about his circumstances. The undisputed facts demonstrate that while the water quality at FLCI was under ongoing review and remediation during the time that Adell complains, it was never unsafe for consumption. The levels of potentially harmful elements did not exceed regulatory health standards. Critically, as explained above, Adell proffered no evidence that he, in light of his medical condition, had special water purity requirements that were more stringent than the EPA dictated. He simply believes this to be true, but Adell's speculation on the matter does not create a triable issue

for the jury. Indeed, in all of his complaints about the water, both now and at the time of the events, not once does Adell say—much less submit verifying medical evidence demonstrating—that he actually became ill or suffered a degradation in his ulcerative colitis symptoms as a result of drinking the water.

Moreover, Adell's claim against Krueger for affirming the dismissal of his complaints is without merit. Adell's first complaint was dismissed because he failed to follow the directions provided to him. His second and third complaints were dismissed as moot because he had left the institution. Dismissal of a complaint "no more manifests 'deliberate indifference' to the underlying problem than does a judge's decision dismissing a § 1983 suit as barred by the statute of limitations." *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). In *Burks*, the Seventh Circuit rejected a claim by an inmate that an institution inmate complaint reviewer rejected his complaint and did not go "beyond the requirements of her job and tr[y] to help him." *Id.* at 596. As the court in *Burks* stated, "[o]ne can imagine a complaint examiner doing her appointed tasks with deliberate indifference to the risks imposed on prisoners. If, for example, a complaint examiner routinely sent each grievance to the shredder without reading it, that might be a ground of liability. *Id.* at 595 (citing *Greeno v. Daley*, 414 F.3d 645, 655–56 (7th Cir. 2005)). Similarly, deliberate indifference might arise where "a complaint examiner [] intervened to prevent the medical unit from delivering needed care[.]" *Id.*

There is no allegation of any such conduct by Krueger here. He simply executed his job duties by dismissing the offender complaints. In addition, Adell alleges that Defendants were deliberately indifferent to his needs because they denied his requests for a single cell so that he could

conserve his water supply, and they denied his requests for a transfer to another institution. Even if Defendants had been aware of these requests, they could not have been deliberately indifferent to them because Adell received both accommodations. Adell was in a single cell during the entire time he was in the RHU. Further, he was transferred to WSPF on January 24, 2017. Thus, even Adell's theory of how the defendants failed to address his needs fails as a factual matter. Consequently, this claim must also be dismissed.

### 3.3 The Statutory Claims

Inexplicably, Defendants ask for dismissal of this entire action although they did not address in any fashion Adell's claims for discrimination and failure to accommodate arising under the Rehabilitation Act and the ADA. *See* (Docket #46 at 1). It would appear that Defendants simply did not read the most recent and operative screening order. *See* (Docket #15). The Court cannot overlook this error, just as it could not forgive Adell's procedural stumbles. However, because the failure to seek summary judgment on these claims was the result of apparent innocent oversight, the Court will permit the remaining Defendants—the DOC and Litscher—a very brief period in which to file a motion for summary judgment on these claims. That schedule will be outlined below.

### 4. CONCLUSION

Viewing the record evidence in the light most favorable to Adell, there is insufficient evidence to raise triable issues of fact as to either of his constitutional claims. The record and the relevant authorities oblige the Court to dismiss those claims and the applicable Defendants.

If the DOC and Litscher wish to seek summary judgment on the statutory claims in this case, they will be permitted an opportunity to do so.

Such a motion must be filed not later than **December 28, 2017**. Adell must respond no later than **twenty-one (21) days** after the motion is filed. Defendants may reply within **seven (7) days** thereafter. If Defendants do not file such a motion by the stated deadline, the Court will issue a trial scheduling order that provides dates for the trial and final pretrial conference, as well as details about the requirements for the parties' pretrial submissions.

Accordingly,

**IT IS ORDERED** that Defendants' motion for summary judgment (Docket #34) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff's claims for inadequate conditions of confinement and deliberate indifference to serious medical needs, both in violation of the Eighth Amendment, be and the same are hereby **DISMISSED**;

**IT IS FURTHER ORDERED** that Defendants Randall Hepp, Chris Krueger, John Maggioncalda, John Congdon, and Mark Schomisch be and the same are hereby **DISMISSED** from this action; and

**IT IS FURTHER ORDERED** that the remaining Defendants may file a motion for summary judgment as to Plaintiff's remaining claims no later than **December 28, 2017**. Plaintiff shall respond no later than **twenty-one (21) days** after the motion is filed. Defendants may reply within **seven (7) days** thereafter.

Dated at Milwaukee, Wisconsin, this 7th day of December, 2017.

BY THE COURT:

J. P. Stadtmueller
U.S. District Court