# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

MARK ANTHONY ADELL,

        Plaintiff,

v.

WISCONSIN DEPARTMENT OF
CORRECTIONS and JON LITSCHER,

        Defendants.

Case No. 17-CV-267-JPS

**ORDER**

    Plaintiff Mark Anthony Adell ("Adell"), a prisoner, brought this action against Defendants, prison officials at Fox Lake Correctional Institution ("FLCI"), the Wisconsin Department of Corrections ("DOC"), and the DOC Secretary, Jon Litscher ("Litscher"), for their alleged failure to properly treat and accommodate Adell's needs arising from his chronic ulcerative colitis. Specifically, Adell alleges that he was forced to drink contaminated water while incarcerated in the restricted housing unit ("RHU") at FLCI between December 12, 2016, and January 24, 2017.

    The Court allowed Adell to proceed on both constitutional claims under 42 U.S.C. § 1983 and statutory claims under the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12132, and the Rehabilitation Act, 29 U.S.C. § 794. *See* (Docket #15). On November 1, 2017, Defendants filed a motion for summary judgment that addressed the constitutional claims only. (Docket #34). That motion was granted in an order dated December 7, 2017. (Docket #48). Because Defendants did not address the remaining statutory claims, the Court permitted the parties a brief window in which

to file supplemental dispositive motions as to those claims. *Id.* at 19–20; (Docket #50 at 2).

The remaining defendants, the DOC and Litscher,[1] filed a supplemental brief and statement of facts in support of their motion for summary judgment, this time addressing Adell's statutory claims, on December 28, 2017. (Docket #52). Adell did not respond. On the state of the record before the Court, and in light of Adell's non-opposition to the supplemental motion, it will be granted and the case will be dismissed.

**1. STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56 provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). The court must not weigh the evidence presented or determine credibility of witnesses; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). The party opposing summary judgment "need not match the movant witness for witness, nor persuade the court that [his] case

---

[1]Because Litscher is joined only in his official capacity, all references to the DOC herein should be understood to include Litscher.

is convincing, [he] need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

2. **RELEVANT FACTS**

    2.1    **Adell's Failure to Dispute the Material Facts**

The relevant facts are undisputed because, as with the prior summary judgment motion, Adell did not dispute them. Indeed, in this instance, unlike last time, Adell simply refused to file anything at all in response to Defendants' motion. With respect to the first motion for summary judgment, the Court explained in some detail why Adell's non-compliance with the applicable procedural rules could not be forgiven. (Docket #48 at 2–4). The Court will largely repeat that discussion here to ensure the completeness of the record, adding to it where appropriate to catalog Adell's continued flouting of the Court's procedural rules and his obligations as a litigant.

In the Court's scheduling order, issued on May 10, 2017, Adell was warned about the requirements for opposing a motion for summary judgment. (Docket #18 at 3). Accompanying that order were copies of Federal Rule of Civil Procedure 56 and Civil Local Rule 56, both of which describe in detail the form and contents of a proper summary judgment submission. Most relevant here is Local Rule 56(b)(2), which obligates the non-movant to file "a concise response to the moving party's statement of facts that must contain a reproduction of each numbered paragraph in the moving party's statement of facts followed by a response to each paragraph, including, in the case of any disagreement, specific references to the affidavits, declarations, parts of the record, and other supporting materials relied upon[.]" Civ. L. R. 56(b)(2)(B)(i).

On November 1, 2017, Defendants filed their first motion for summary judgment. (Docket #34). In the motion, Defendants also warned Adell about the requirements for his response as set forth in Federal and Local Rules 56. *Id.* at 1–2. Defendants provided him with additional copies of those Rules. *See id.* at 3–12. In connection with their motion, Defendants filed a statement of material facts that complied with the applicable rules. (Docket #35). In response, Adell submitted three documents, none of which came close to properly responding to Defendants' statement of facts. *See* (Docket #43, #44, #45); (Docket #48 at 3–4).

The Court explained Adell's failures in its recent decision on the first motion for summary judgment. It observed that "[d]espite being twice warned of the strictures of summary judgment procedure, Adell ignored those rules by failing to properly dispute Defendants' proffered facts with citations to relevant, admissible evidence." (Docket #48 at 4). As a consequence, even in view of Adell's *pro se* status, the Court found that it would not excuse Adell's non-compliance. *Id.* Instead, all of Defendants' proffered facts were deemed admitted, and those undisputed facts necessitated dismissal of Adell's constitutional claims. *Id.*; Civ. L. R. 56(b)(4); *Hill v. Thalacker*, 210 F. App'x 513, 515 (7th Cir. 2006).

The Court hoped that after so many warnings, Adell would not repeat his error in the face of Defendants' supplemental motion for summary judgment. Unfortunately, it was not to be. First, after railing unsuccessfully against the Court's allowing Defendants to pursue another dispositive motion, *see* (Docket #50, #56), Adell simply refused to accept service of Defendants' motion when prison officials at his new institution, the Wisconsin Secure Program Facility ("WSPF"), attempted to give it to

him on January 3, 2018. *See* (Docket #59 at 2). He shouted at the correctional officer and used profanity. *Id.* at 2–3.

Adell complains that he was required to "verify" his mail before receipt and, feeling that this was an unlawful request, refused to comply. (Docket #62 at 2). In reality, prison records reveal that pursuant to DOC policy, guards must open legal mail in the inmate's presence. *See* (Docket #60-1 at 8). The guard on January 3 asked Adell to confirm that he should open Adell's package from Defendants' counsel, and he refused, angrily. (Docket #60-2 at 2).

This is a case about FLCI's compliance with the ADA and the Rehabilitation Act. The Court refuses to become embroiled in Adell's sideline dispute about the propriety of mail delivery procedures at WSPF. He knew well that Defendants were allowed to file a supplemental dispositive motion on or before December 28, 2017. When, a few days after that date, some legal mail arrived for him, it defies credulity that Adell did not know what it was. To refuse to accept service of a motion is not only egregious misconduct by any litigant, *pro se* or represented, it also cannot conceivably be an excuse for later non-compliance with the Court's orders. Whatever Adell thought about the "verification" requirement, he was under a duty to meet this Court's deadlines. His juvenile behavior on January 3 makes things all the worse for him, not better.[2]

Because he refused to accept his mail that day, Adell believed no motion had been filed and asked the Court to proceed with trial in a motion

---

[2]It is noteworthy that despite the voluminous filings and proceedings in this and Adell's related case, *Adell v. Hepp*, 17-CV-448-JPS (E.D. Wis.), this is the very first time an issue with receipt of legal mail has arisen, casting further doubt on the credibility of Adell's representations.

filed on January 9. (Docket #57). The Court denied the motion on January 12 and directed Adell to comply with the Court's previously imposed response deadline of January 18, 2018, which had been in place since the Court's disposition of the first summary judgment motion on December 7, 2017. (Docket #58). He did not. Instead, he filed yet another motion for reconsideration, explaining the scuffle over the January 3 mail delivery and complaining that January 18 was too soon for him to file anything. (Docket #62 at 4).

The Court has taken great care to explain to Adell his obligations as a litigant and his responsibility to timely respond appropriately when the serious matter of summary judgment arises. He defied those instructions, behaved inappropriately, and now expects additional time to rectify his error. Although a *pro se* litigant's filings are to be construed generously, the Court is neither Adell's lawyer nor his keeper. The Court will not extend his response deadline, and in light of his conduct, Adell can hardly expect sympathy. As the deadline to respond to Defendants' motion has long since passed, the Court will take as undisputed all the facts stated in Defendants' supplemental statement of material facts. (Docket #53).[3]

---

[3]For similar reasons, the Court will deny Adell's motion requesting the appointment of counsel, filed on January 24, 2018. (Docket #64). First, Adell has requested the appointment of counsel several times before, and each time he failed to present sufficient evidence supporting the request. *See* (Docket #20, #37). The present motion does not cure that deficiency. The Court continues to believe that Adell has the ability to competently litigate this case, when he chooses to do so. The facts in this case are not complex, particularly those key facts Adell needed to dispute in order to save his claims from dismissal, as will be seen below. Second, and more importantly, Adell's motion seeks the aid of counsel to respond to Defendants' supplemental dispositive motion, yet the request was filed *after* Adell's response deadline had already passed. Adell was fully able to understand this deadline and no knowledge or skill of counsel could remedy his failure to comply with it.

**2.2   Facts Material to Defendants' Motion**[4]

As detailed in the Court's prior ruling, Adell complains that during his confinement in the RHU at FLCI, he was not afforded clean drinking water. Adell claims that he needs clean water at all times and in great quantities because he suffers from ulcerative colitis. According to him, not only will contaminated water aggravate his symptoms, he also needs water to combine with powdered Gatorade mix to help alleviate his symptoms.

FLCI experienced some water quality issues that led to an agreement in 2014 with the Wisconsin Department of Natural Resources ("DNR") to improve water quality. Nothing about that process ever involved a finding that the water was unsafe for human consumption. The agreement was terminated in December 2016 in light of FLCI's successful efforts to improve water quality.

Between March 11, 2014 and January 24, 2017, Adell was housed at FLCI. From December 12, 2016 to January 24, 2017, Adell was housed in the RHU. When he was first taken to the RHU, a correctional officer attempted to place him in a cell with another inmate. When Adell refused, he was assigned to a single-person cell, which he occupied for the entire time he was in the RHU. He was separately issued a conduct report for his disobedience. On January 24, 2017, Adell was transferred to WSPF.

---

[4] The facts recited herein come from the parties' original and supplemental factual briefing. *See* (Docket #35, #47, #53). As noted above, the Court directed Defendants to file a second motion for summary judgment, *see* (Docket #48 at 19), but instead they decided to supplement their existing filing with a new brief and an additional statement of material, undisputed facts. Adell might well have complained about importing facts from an earlier motion for consideration in connection with this one, but his failure to respond to either motions' statement of facts means that the complaint is merely hypothetical.

Elevated levels of manganese and iron were detected at FLCI following testing in June 2016. Iron and manganese compounds are common in Wisconsin groundwater and only affect its appearance and taste, not its safety. The test results also showed that lead and copper levels were well below EPA-mandated thresholds. On June 30, 2016, FLCI's warden sent a notice to all inmates and prison staff explaining that lead and copper testing showed both to be within acceptable limits.

The DNR notified FLCI in a letter dated October 10, 2016 that the elevated levels of iron and manganese were above aesthetic levels but did not create a health risk. DNR required that FLCI post a notice to warn inmates and staff about these elements. The notice explained that the water remained safe to drink, although it might not look, smell, or taste very good. It also stated that infants, young children, and those with liver disease were at risk of health problems if they had prolonged exposure to high levels of manganese in water. The notice said nothing about auto-immune diseases.

Abigail Cantor ("Cantor"), an engineer hired to help remediate FLCI's water quality problems, testified at her deposition in a related case that some unknown event around October 31, 2016, perhaps in the prison's well or in the piping system, caused a disturbance in the water system which released some additional iron into the water supply, discoloring it. This may have formed the predicate for Adell's first complaint of contaminated water. On November 16, 2016, he filed an offender complaint, alleging in part that "[t]he water here at FLCI is contaminated and the water report itself confirms that people with the type of medical problems I have (autoimmune) are at a high risk. . . . While at recreation the water is unsafe as it pertains to my consumption." (Docket #38-1 at 11–12). He asked to be transferred to another institution. *Id.*

The complaint was returned to Adell because it contained more than one issue, in violation of DOC regulations. He was instructed to address his medical issues to the health services manager and his issues with restroom use, water quality, and requesting an institution transfer to the program director. Adell failed to do so and the complaint was dismissed by the inmate complaint examiner. Chris Krueger ("Krueger"), the deputy warden, affirmed the dismissal.

Cantor testified that there has only been one notable lead release event since she has monitored FLCI. That event occurred in December 2016, and was caused during maintenance on the prison's fire protection system, which is connected to the municipal water system. Cantor theorizes that the fire suppression contractor opened and closed the valves quickly during testing, which likely resulted in the disturbance of accumulations, which in turn caused discolored water. If discolored water is discovered at FLCI, the facilities manager and water systems operator flush the system to get the disturbed accumulation out, and they did so in January 2017.

Adell submitted another complaint on December 16, 2016, four days after entering the RHU, stating that "[t]he water at FLCI is contaminated. Advisory memos suggest that we allow the water to run in advance of drinking it to allow contaminants to be flushed. But for the new plumbing system installed at the seg building that is impossible. The system restricts use of water to 4 pushes per hour. . .every cup of water contains small metal flakes that settle at the bottom of the cup. There is no possible way to flush the system because it will lock you out." (Docket #38-2 at 7). Adell did not request any remediation of this problem; he simply warned the prison that he would seek money damages in a lawsuit. *See id.* at 8. This complaint was

rejected as moot because Adell was transferred to WSPF before the complaint was investigated. Krueger affirmed the rejection.

On December 22, 2016, a public notice was posted at FLCI concerning the close-out of the DNR agreement earlier that month and the most recent water test results, which demonstrated that lead and copper levels were well below the established thresholds for compliance. The notice warned that if the inmates wanted to further reduce their exposure to lead and copper in the drinking water, they could run the faucet briefly before drinking.

Adell submitted one other relevant complaint, on January 14, 2017. The complaint states that the water in his toilet and sink "had a brown tinge and sulfuric scent. Due to the water restrictions limited access to water/toilet usage, I was unable to flush the system—doing so would cause the water to lock me out of the system for one hour—only a few flushes/water button pushes allowed." (Docket #38-3 at 7). Adell asserted that the water quality, coupled with the limitations in the water system, put him at "an unreasonable risk due to my medical condition which is autoimmune." *Id.* at 7–8. He again demanded transfer to another institution. *Id.* at 8. This complaint was rejected as moot because Adell had already been transferred to WSPF. Krueger again affirmed the rejection.

Toilets in the RHU at FLCI operate via an electronic controller system. This system was installed in the RHU in October 2016. After an inmate presses the flush button for the toilet, the controller operates a water valve for ten seconds and the toilet flushes. When a flush cycle is completed, the inmate may initiate an additional flush. If an inmate attempts to flush the toilet more than three times in approximately fifteen minutes or less, the flushing system shuts down for approximately one hour, at which time the

system will reset and continue working. This is to prevent inmates from purposely overflowing their toilet. In an hour, an inmate could flush his toilet approximately twelve times without the system locking him out.

The faucets in each RHU cell operate via the same system. Water from the faucet is timed to run for about ten seconds before it shuts off. The amount of water run from the faucet during each use varies between six and eight ounces. If an inmate attempts to use the faucet button more than three times in approximately fifteen minutes or less, the faucet button shuts down for approximately one hour, at which time the system will reset and continue working. This is to prevent inmates from purposely overflowing their sink. In one hour, an inmate could run a hot or cold faucet button about twelve times each without the system locking him out, for a total of approximately 72–96 ounces of water per hour.

Upon intake at FLCI, inmates are given a copy of the inmate handbook. The handbook notifies inmates that to initiate the process for an accommodation under the ADA, they must contact the ADA coordinator by completing a DOC-2530 Reasonable Modification/Accommodations Request form.

Sarah Feltes ("Feltes") is the ADA coordinator at FLCI. She reviews inmate ADA requests that are submitted on a DOC-2530 form. When an inmate submits such a form, Feltes reads it to see what accommodation the inmate is requesting. She will then consult with staff members from FLCI's Health Services Unit or Psychological Services Unit, as well as review WICS, a DOC database program, to see if the inmate's alleged disability is documented. Finally, Feltes determines whether FLCI can meet the inmate's request or if it is an accommodation that needs to be reviewed by

security personnel. Feltes may meet with the inmate if further explanation or clarification is needed.

In Feltes's capacity as the ADA coordinator, she has searched the relevant DOC records and found that Adell has never submitted a DOC-2530 form asking for an accommodation at FLCI. If Adell had used the more common interview/information request form incorrectly as an ADA accommodation request form, Feltes would have returned the information/interview request to Adell along with a blank DOC-2530 form and directed him to complete the proper form. As far as DOC records show, Adell never requested an accommodation at FLCI allowing him a single cell or access to cleaner drinking water or toilet facilities while in the RHU.

3. ANALYSIS

Adell claims that the DOC denied him access to clean drinking water in the RHU at FLCI, in violation of Title II of the ADA and the Rehabilitation Act. He further asserts that the institution violated these statutes by failing to either single-cell him in the RHU or transfer him to a different institution with cleaner water. Both the ADA and the Rehabilitation Act apply to state prisoners. *Cassidy v. Ind. Dep't of Corr.*, 199 F.3d 374, 375 (7th Cir. 2000). The Court will address each statute in turn.

   3.1 **Americans With Disabilities Act**

The Court must dismiss the ADA claim without reaching its merits. Whether the DOC has sovereign immunity against claims under the ADA is an open question, except in instances in which the alleged ADA violation is also a violation of a constitutional right, such as a right under the Eighth Amendment. *United States v. Georgia*, 546 U.S. 151, 158–59 (2006); *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 672 & n.5 (7th Cir. 2012). In *Georgia*, the Court expressly declined to decide whether states are immune from suits for

damages arising from conditions that violate the ADA but not the Constitution. *Georgia*, 546 U.S. at 159. The Court has already determined that Adell's claims for constitutional violations were without merit. (Docket #48). Thus, it is unlikely that Adell can continue to maintain an ADA claim.

This defect has, however, no real import in this case. The Rehabilitation Act is "materially identical to and the model for the ADA except that it is limited to programs that receive federal financial assistance." *Crawford v. Ind. Dep't of Corr.*, 115 F.3d 481, 483 (7th Cir. 1997); *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015). Because Wisconsin receives federal funds for its prisons, this latter element is no impediment. *Stanley v. Litscher*, 213 F.3d 340, 344 (7th Cir. 2000). The relief under the ADA and Rehabilitation Act is also coextensive. *Jaros*, 684 F.3d at 671. As a practical matter, then, the Seventh Circuit has dismissed a state inmate's ADA claim when stated alongside a Rehabilitation Act claim without addressing the issue of sovereign immunity because the inmate can have but one recovery. *See id.* at 672. This Court will do the same.

### 3.2 Rehabilitation Act

This leaves Adell's Rehabilitation Act claim. The Act provides, in relevant part:

> No otherwise qualified individual with a disability in the United States. . .shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794(a). "Otherwise qualified" means the plaintiff must show that, were it not for his disability, he would have qualified for the benefit, treatment, or program which he was denied. *Grzan v. Charter Hosp. of Nw. Ind.*, 104 F.3d 116, 120–21 (7th Cir. 1997). "Program or activity" is defined in

the Act, in pertinent part, as the operation of a "department, agency, special purpose district, or other instrumentality of a state or local government." 29 U.S.C. § 297(b)(1)(A).

Adell's Rehabilitation Act claim is premised on both intentional discrimination and a failure to provide reasonable accommodations. Either claim requires a showing that: (1) Adell is a qualified person; (2) with a disability; and (3) the DOC denied him access to a program or activity solely because of his disability. *Jaros*, 684 F.3d at 672; *Reed v. Columbia St. Mary's Hosp.*, 236 F. Supp. 3d 1091, 1105 (E.D. Wis. 2017). With respect to Adell's intentional discrimination theory, the Seventh Circuit has yet to decide whether discriminatory animus or deliberate indifference must be proven. *Strominger v. Brock*, 582 F. App'x 508, 511 (7th Cir. 2014). The majority of Circuits that have addressed the issue have adopted a deliberate indifference standard. *See Reed v. Illinois*, 119 F. Supp. 3d 879, 885 (N.D. Ill. 2015). Deliberate indifference "requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001), *as amended on denial of reh'g* (Oct. 11, 2001). Under either standard, however, "[m]ere negligence is insufficient[.]" *Strominger*, 58 F. App'x at 512.

Adell's alternative theory is that the DOC failed to make reasonable accommodations for his condition by refusing to single-cell him in the RHU and then refusing to transfer him to another prison. Failing to make reasonable accommodations is tantamount to denying access to a covered program. *Alexander v. Choate*, 469 U.S. 287, 300–01 (1985); *Dadian v. Vill. of Wilmette*, 269 F.3d 831, 838 (7th Cir. 2001). In the prison context, whether accommodations are reasonable must be judged "in light of the overall institutional requirements," including "[s]ecurity concerns, safety concerns,

and administrative exigencies." *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 561 (7th Cir. 1996); 28 C.F.R. § 35.130(h). Determining the reasonableness of a particular accommodation is "highly fact-specific" and is decided on a case-by-case basis. *Dadian*, 269 F.3d at 838.

Adell's Rehabilitation Act claim cannot proceed under either of his proffered theories. First, the RHU's water system exists to keep inmates from purposefully overflowing their toilets or sinks. The system was not put in place because of any animus against the disabled. *Strominger*, 592 F. App'x at 511.

Even under the less-stringent deliberate indifference standard, the claim fails. Adell complained in November 2016 and January 2017 that he was at a high risk of harm from poor water quality because of his autoimmune disease. Of course, he had no evidence of this, and nothing in the notices distributed to inmates suggested that people like him were especially vulnerable. Adell was instructed to pursue relief with the health services staff, but failed to follow through.

His first complaint about the RHU water system in particular came on December 16, 2016. He misstated the functioning of the system, claiming it only allowed four water bursts per hour. Similarly, on January 14, 2017, he claimed, incorrectly, that he could only get a few flushes of the toilet per hour. Prison officials knew he was wrong. Further, because they had no notice that the full water supply available to Adell in the RHU was inadequate in light of his condition, it cannot be said that the prison knew Adell's health was in jeopardy and failed to act. *See Duvall*, 260 F.3d at 1139. Thus, Adell's intentional discrimination claim fails.

Similarly, the DOC did not deny Adell a reasonable accommodation while he was housed in the RHU. His request for single-celling was in fact

granted.[5] And as to the institution transfer request, the undisputed facts reveal that Adell never utilized the processes available to him for requesting an accommodation, whether through the ADA coordinator or the health services unit. He had a copy of the handbook that laid out his options, but he never availed himself of the opportunity to seek a cooperative resolution. Granted, Adell filed a few inmate grievances on the matter, but this was not the proper way to request an accommodation under the prison's rules.

In ADA and Rehabilitation Act cases, the plaintiff must normally request an accommodation before liability attaches. *Jovanovic v In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 899 (7th Cir. 2000); *Fleishman v. Continental Cas. Co.*, 698 F.3d 598, 608 (7th Cir. 2012). This duty is "dictated by common sense[,] lest a disabled employee keep his disability a secret and sue later for failure to accommodate." *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1134 (7th Cir. 1996). The plaintiff's request then triggers the defendant's obligation to make reasonable efforts to reach a mutually agreeable and effective accommodation. *Jovanovic*, 201 F.3d at 899. As the Seventh Circuit has explained:

> [r]easonable accommodation under the ADA is a process, not a one-off event. The process begins with the employee, who has the initial duty to inform the employer of the disability. *See Sears*, 417 F.3d at 803–04. Absent special circumstances, like a severe cognitive disability or mental illness, *see Bultemeyer v. Ft. Wayne Cmty. Schs.*, 100 F.3d 1281, 1285–87 (7th

---

[5]Adell complains that he received an unwarranted conduct report for requesting single-celling, but this is immaterial to whether the accommodation was made. Moreover, Adell's refusal to accept a double cell as ordered by an officer was a proper basis for a conduct report; if he wanted to receive single-celling as an accommodation, he should have submitted an ADA accommodation request, but he did not.

> Cir. 1996), the employee's initial duty requires that he or she "indicate to the employer that she has a disability and desires an accommodation," *Sears*, 417 F.3d at 803.

*Cloe v. City of Indianapolis*, 712 F.3d 1171, 1178 (7th Cir. 2013), *overruled on other grounds*, *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016). In this case, Adell has not contended, nor could he credibly contend, that his disability affected his powers of communication. There is no reason justifying his non-compliance with the prison's ADA procedures.

Further, it must be remembered that Adell submitted *no* evidence to FLCI officials or this Court showing that he in fact needed any accommodation for his ulcerative colitis. All the evidence suggests that Adell had ample access to clean drinking water. He could flush his RHU toilet approximately twelve times per hour. He could also run his faucet twelve times each hour, for a total of 72–96 ounces of water. Even if he used some flushes to run the water to clear it of visible particulate matter, he easily had access to more than twenty ounces of water per hour. This provided Adell a steady supply of drinking water for him to consume and mix his Gatorade drinks. Adell has nothing, other than his own steadfast belief, to support the notion that he needed special treatment in light of his bowel condition. He cannot bootstrap a need for accommodation into existence by the strength of his conviction.[6]

---

[6] It is also worth noting that the Court determined in the first summary judgment decision that the water at FLCI was safe. (Docket #48 at 10). The levels of copper, lead, manganese, and iron in the water did not exceed any EPA health standards in December 2016 or January 2017 when Adell was housed in the RHU. *Id.* at 13. Moreover, Adell "proffered no evidence that he, in light of his medical condition, had special water purity requirements that were more stringent than the EPA dictated." *Id.* at 17. That lack of evidence concerning Adell's condition continues to fatally undermine his claims.

Because the evidence in the case establishes that Adell was not subject to discrimination based on his disability and neither requested nor needed an accommodation therefor, his Rehabilitation Act claims must be dismissed.

4.   **CONCLUSION**

Viewing the record evidence in the light most favorable to Adell, there is insufficient evidence to raise triable issues of fact as to any of his remaining claims. The record and the relevant authorities oblige the Court to dismiss this case in its entirety.

Accordingly,

**IT IS ORDERED** that Plaintiff's January 17, 2018 motion for reconsideration or an extension of time (Docket #62) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Plaintiff's motion requesting the appointment of counsel (Docket #64) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Defendants' supplemental motion for summary judgment (Docket #52) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff's claims under the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12132, and the Rehabilitation Act, 29 U.S.C. § 794, be and the same are hereby **DISMISSED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 14th day of February, 2018.

BY THE COURT:

_____
J. P. Stadtmueller
U.S. District Court